UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

**DANIEL SANDERS**                                                                                    **PLAINTIFF**
**ADC # 094279**

**VS.**                            **5:16-CV-00190-JM-JTR**

**KENNETH BOLDEN and**
**KRISTENA ROSALES-CALLOWAY**                                      **DEFENDANTS**

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge James Moody, Jr. Any party may file written objections to this Recommendation. Objections must be specific and include the factual or legal basis for disagreeing with the Recommendation. An objection to a factual finding must specifically identify the finding of fact believed to be wrong and describe the evidence that supports that belief.

An original and one copy of the objections must be received in the office of the United States District Clerk within fourteen (14) days of this Recommendation. If no objections are filed, Judge Moody can adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may also waive any right to appeal questions of fact.

## I. Introduction

Plaintiff Daniel Sanders ("Sanders"), proceeding *pro se*, contends that his constitutional rights were violated when Defendants failed to protect him from an attack by a fellow prisoner on July 17, 2013, in the Varner Unit of the Arkansas Department of Correction ("ADC"). *Docs. 8 & 27*.

Sanders seeks, as to each Defendant, $25,000 in compensatory damages and $10,000 in punitive damages. *Doc. 8 at 14*. He also requests declaratory relief that his constitutional rights were violated and injunctive relief requiring that he be housed at the Delta Regional Unit until he is paroled. *Doc. 8 at 8*.

On September 20, 2016, the Court dismissed, on screening, Sanders' claim that he was wrongfully issued a disciplinary for his role in the July 17, 2013 attack and that the disciplinary was issued in retaliation for him filing a grievance about the attack. Sanders was permitted to proceed solely on his failure to protect claim. *Doc. 10 & 12*.

On April 28, 2017, the Court: (1) granted partial summary judgment to separate Defendants Correction Officer J.G. Garcia, Warden Randy Watson, Assistant Warden Meinzer, Assistant Warden Jackson, and Classification Officer Washington;[1] and (2) allowed the case to proceed solely as to Sanders' failure to

---

[1] The Court dismissed Sanders' claims against those five Defendants based on their allegedly providing inadequate security at the Varner Unit; improperly training correctional

protect claims against separate Defendants Major Kenneth Bolden ("Bolden") and Correctional Officer Kristena Rosales-Calloway ("Rosales-Calloway"). *Docs. 48 & 57.*[2] *Doc. 48 at 4-7.*

Bolden and Rosales-Calloway have filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts.[3] *Docs. 63-65.* Sanders has filed a Response. *Doc. 81.*

---

officers; and returning Sanders to general population when he was physically vulnerable to another attack due to a prior injury. *Doc. 48 at 7.*

[2] In grievance VU 13-869, Sanders makes the following allegations against Bolden and Rosales-Calloway:
> On July 17, 2013, around 3:50 a.m., I was returning from breakfast and coming through the tunnel (Zone 3) when me and A. Moore saw inmate Jackson leaning against the wall by Mr. Lamb's office. . . . As we proceeded past him approaching COI K. Rosales she hollered something. I turned around and saw inmate Jackson pulling a board out of his pants, running toward me, swinging for my head. I threw up my left hand and was struck in the side of it. Then I'm hit in head 2 or 3 times before I was able to breakaway from him and run in 15 & 17 booth and slam the door on his arm and hold him there until security comes. . . . This was the 2nd attack on my life and I did bring it to Major K. Bolden's attention 7/15/13 at lunch in front of the chow hall review camera for Zone 2. . . .

*Doc. 48 at 4-5* (quoting from grievance*) & Doc. 32-3.*
As Sanders makes clear in his deposition, this was the first and only time Sanders was attacked by Jackson. *Doc. 63-1 at 65.* Sanders's reference to the other "attack on my life" took place a month earlier and was carried out by *another prisoner*.

[3] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

Before reaching the merits of Defendants' Motion for Summary Judgment, the Court will review the relevant undisputed facts giving rise to Sanders' failure to protect claims.

1. In July of 2013, Sanders was housed in Barracks 19 of the Varner Unit, which has a capacity of 50-52 inmates. Barracks 19 is an "open barracks." *Doc. 63-1 at p. 16-18, 21-22*.

2. Early on July 17, 2013, at approximately 3:50 a.m., Sanders was returning to Barracks 19 after eating breakfast.[4] Sanders' attacker, Ethan Jackson ("Jackson"), lived in Barracks 22 and was on crutches.[5] He modified a two-foot piece of one of his wooden crutches into a weapon and hid it in his pants. After Sanders walked past Inmate Jackson, who was leaning against the wall in the hallway, Inmate Jackson attacked him from behind. *Doc. 63-1 at p. 26, 48, 51*.

3. Defendant Rosales-Calloway was standing at her post, close to Sanders and Inmate Jackson, when the attack occurred. She shouted "hey, hey, hey, hey" either to stop Jackson or to warn Sanders of the surprise attack. *Doc. 63-1 at p. 39-41*.

---

[4] Sanders, who is diabetic, routinely ate breakfast with the other "diabetic chow" inmates from Barracks 19. The diabetic chow inmates were awakened first, before the regular population, and left the barracks as a group to get their medications and breakfast. *Doc. 63-1 at p. 16, 22-24*.

[5] It is undisputed that, at the time of the attack, Jackson had a valid script for crutches. *Doc. 63-1 at p. 49*; Doc. 32-3 at 2.

4

4. The attack was captured on video.[6] The video shows that the fight lasted 12 seconds, from 3:48:46 to 3:48:58, at which point Sanders was able to secure himself in a control booth and pin Inmate Jackson's arm in the door until help arrived. At 3:49:46, forty-eight seconds after the attack began, four officers arrived on the scene. Fourteen seconds later, at 3:49:48, four more officers arrived. Inmate Jackson was handcuffed and taken away. Officers then spent several minutes convincing Sanders to come out of the control booth. *Doc. 63-1 at 86-89.*

5. During the attack, Inmate Jackson hit Sanders three to four times with the modified crutch, landing two or three blows to Sanders's head and one blow to his arm. Sanders sustained a wound to his head and a small wound to his hand. *Doc. 63-1 at 28.*

6. Immediately after the attack, Sanders was taken to the infirmary, where he was treated for his injuries, which healed completely in three weeks to a month. *Doc. 63-1 at 83-90.*

7. At the time of the attack, Sanders had two inmates on his enemy alert list. Inmate Jackson was *not* one of them. Until Inmate Jackson attacked him, Sanders did not know who Jackson was and he had no reason to believe that Jackson might attack him. *Doc. 63-1 at p. 27, 32, 48; 55, 65.* Similarly, Bolden and Rosales-

---

[6] Although the video's quality is poor, Sanders verified the video's authenticity and accuracy during his deposition. *Doc. 63-1 at 81-89.*

Calloway also had no reason to believe that Jackson might launch a surprise attack against Sanders.

8.   Immediately after the attack, prison officials placed Jackson on Sanders's enemy alert list. Since that time, they have not been housed near one another and have had no further conflict. *Doc. 63-4; Doc. 63-1 at 67-68*.

9.   Sanders does not recall seeing Rosales-Calloway on his way to breakfast on the morning of July 17th. After trying to stop Jackson's attack or warn Sanders by screaming, "hey, hey, hey, hey," Rosales-Calloway immediately radioed for officer assistance. Less than a minute after the fight started, four officers arrived, and fourteen seconds later, they were joined by four more officers. *Doc. 63-1 at p. 32-33, 39, 40, 62, 77, 87*.

10.   According to Sanders, because Rosales-Calloway allowed Inmate Jackson to "linger" in the hallway, she failed to protect him from Jackson's attack. Sanders also asserts that it was a violation of ADC policy for Rosales-Calloway to allow Jackson to remain in the hallway. *Id. at 37-39; 76, 78*.

11.   At all relevant times, Defendant Bolden was a Major at the Varner Unit. *Doc. 27*. Bolden was not present when the attack occurred. However, Sanders faults Bolden because two days earlier, on July 15, 2017, Sanders saw Bolden at lunch and told him "in general I feel [sic] for my safety." However, in his conversation with Bolden, Sanders did *not*: (1) provide Bolden with the names of any prisoner(s) he

feared; (2) state to Bolden that an attack was imminent; or (3) provide any details to Bolden beyond his expression of a generalized "fear for my safety." Instead, he asked Bolden to transfer him to another ADC facility.

12. According to Sanders, Bolden told him to "put a request in" for an office meeing so they could discuss the matter in more detail. Later on July 15th, Sanders states that he submitted a written request to speak with Bolden privately, but his request had not been acted on at the time of the attack. Accepting all of these facts as true, this means less than forty hours elapsed between the time Sanders requested a meeting with Bolden and the time of the attack.[7] *Doc. 63-1 at 45-46, 56-67, 69-70.*

13. Following the attack, both Jackson and Sanders received disciplinaries. Jackson was found guilty of battery, assault, aggravated battery on an inmate, failure to obey a staff order, and committing a felony act. As punishment, he received 30 days in punitive isolation and loss of other privileges. *Doc. 63-3*. Sanders was found guilty of failure to obey a staff order to stop fighting and use of force on an inmate. As punishment, he received 15 days in punitive isolation. *Doc. 63-2*. Both inmates received a loss of class.

---

[7] Sanders has not produced his alleged written request for this meeting, which makes it impossible to know if or when Bolden may have received it. Sanders alleges that he completed the request after speaking with Bolden at "lunch." Giving Sanders the benefit of the doubt and assuming he submitted the written request during the afternoon of July 15th, this means less than forty hours elapsed before the 3:58 a.m. attack on July 17th.

## II. Discussion

### A. Official Capacity Claims

Sanders claims for monetary damages are asserted against both Defendants in their "official" and "individual" capacities. *Doc. 1 at 4*. The doctrine of sovereign immunity precludes Sanders from obtaining monetary damages against Bolden and Rosales-Calloway in their official capacities. *See Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012); *Larson v. Kempker*, 414 F.3d 936, 939 (8th Cir. 2005). Accordingly, Sanders's claims against them, in their official capacities, should be dismissed, with prejudice.

Sanders also seeks injunctive relief directing that his current housing at Delta Regional Unit continue until he is paroled. Because Bolden and Rosales-Calloway are entitled to summary judgment on Sanders's failure-to-protect claim, his claim for injunctive relief also fails and should be dismissed, with prejudice. *Oglala Sioux Tribe v. C&W Enterprises, Inc.*, 542 F.3d 224 (8th Cir. 2008) ("A permanent injunction requires the moving party to show actual success on the merits . . .").

### B. Individual Capacity Claims

The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to "take reasonable measures to guarantee" inmate safety by protecting them from attacks by other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). However, prison officials do not commit a constitutional violation every

time one prisoner attacks another. *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007); *Blades v. Schuetzle*, 302 F.3d 801, 803-04 (8th Cir. 2002). Instead, to prevail on his failure to protect claim, Sanders must prove that: (1) objectively, Defendants should have been aware of a substantial risk of serious harm to him from an attack by Jackson; and (2) subjectively, Defendants were deliberately indifferent to that substantial risk of serious harm. *See Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011); *Young*, 508 F.3d at 872. An official is deliberately indifferent only if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

To satisfy the first objective element, an inmate must show that a prison official's failure to take action resulted in the inmate being "incarcerated under conditions posing a substantial risk of serious harm." *Young v. Selk*, 508 F.3d 868 (8th Cir. 2007). Sanders points to the following evidence to support his claim that he was at serious risk of harm: (1) he had been attacked on June 18, 2013, approximately one month earlier, *by a different inmate*; (2) about forty hours before the July 17th attack, he expressed a *generalized fear* for his safety to Bolden and requested a transfer from Varner; and (3) Rosales-Calloway created a risk of harm by permitting Jackson to lean against the wall in the hallway before the attack.

Because a *different inmate* attacked Sanders, approximately one month before Jackson's surprise attack on July 17, it is not evidence that "objectively, there was a substantial risk of harm" to Sanders at the time of the second attack. Jackson had no known connection to the first attack and was not someone Sanders knew, much less had reason to fear. The fact that Sanders previously had been attacked by another prisoner, in a completely unrelated assault, falls short of constituting objective evidence that Bolden or Rosales-Calloway knew that Sanders was at "substantial risk of harm" from Jackson's surprise attack on July 17th. *Boyce v. Moore*, 314 F.3d 884, 888-87, 889-91 (7th Cir. 2002).

While Sanders argues that Bolden *could* have prevented the attack if he had heeded Sanders's generalized expression of fear on July 15th, it is undisputed that all Sanders told Bolden (approximately 1 ½ day before the attack), was that he felt scared for his safety – a feeling most prisoners and guards probably struggle with from time to time. Sanders's vague feeling of concern for his safety simply was not sufficient "objectively" to put Bolden on notice "there was a substantial risk of harm" to Sanders. Importantly, Sanders did not tell Bolden that he was having a problem with any particular prisoner; did not state any facts suggesting another

attack was imminent; and did not request protective custody. Instead, he told Bolden he wanted to be transferred from the Varner Unit.[8]

In response to Sanders's expression of a generalized fear for his safety, Bolden told him to make a written request to see him in his office to further discuss the matter. *Doc. 63-1 at 56-58*. Sanders claims he made such a request, later on July 15th, and that his request was still pending when he was attacked at 3:50 a.m. on July 17th. Sanders has not submitted a copy of the request itself, or provided any evidence that Bolden saw the request. However, even if Sanders submitted the written request and Bolden read it before Jackson's surprise attack, it fails to establish that, objectively, Bolden should have known Sanders was at "risk of substantial harm" from a prisoner whom no one – *including Sanders* – had any reason to believe might want to harm him.

Sanders makes the unsubstantiated allegation that Rosales-Calloway violated ADC policy when she permitted Jackson to stand around in the hallway before the attack. However, even if such an ADC policy existed and Rosales-Calloway failed to follow it, this creates no basis for liability under § 1983. *See Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) (§ 1983 liability must be predicated on a

---

[8] It is well settled that prisoners do not have a liberty interest in being housed in or transferred to a particular prison unit. *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Pereshini v. Callaway*, 651 F.3d 802, 807 n. 4. (8th Cir. 2011); *Rouse v. Benson*, 193 F.3d 936, 940 (8th Cir. 1999).

11

constitutional violation, not a mere violation of prison policy). Viewing the facts in a light most favorable to Sanders, there simply is no evidence that, objectively, Rosales-Calloway should have known that Sanders was at "risk of substantial harm" when Jackson launched his surprise attack.

It is undisputed that Jackson attacked Sanders without warning and nothing in the facts suggests that this attack was either anticipated or imminent when it took place. Sanders did not know Jackson before the attack, had no reason to fear him, and had never voiced any concern to any prison official that Jackson posed a risk to him. Thus, it is undisputed that no one – *not even Sanders* – expected that, Jackson would attack him that morning.

Finally, there is nothing about the circumstances of the attack to suggest that, subjectively, Bolden and Rosales-Calloway acted with deliberate indifference. Bolden was not present when the attack occurred and there is no evidence that he had any reason to believe, based on the generalized safety concern Sanders voiced, shortly before the attack, that he was in any danger – imminent or otherwise – of being attacked by another prisoner. Rosales-Calloway was present when the attack began, and she yelled a warning in an effort to stop the attack or warn Sanders it was

about to take place. When that failed, she immediately radioed for help, which arrive almost immediately after the attack began.[9]

At best, the facts Sanders offers might support a claim against Bolden and Rosales-Calloway for negligence, but not the far higher deliberate indifference standard governing the failure to protect claim he has asserted against them under § 1983. A prison guard's negligence, or even gross negligence, is not actionable under § 1983. *See Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003); *Tucker*, 276 F.3d at 1002.

Accordingly, Bolden and Rosales-Calloway are entitled to summary judgment on the failure to protect claims Sanders has asserted against them, in their individual capacities, and those claims should be dismissed, with prejudice. [10]

### III.   Conclusion

IT IS THEREFORE RECOMMENDED THAT Defendants Bolden and Rosales-Calloway's Motion for Summary Judgment *(Doc. 63)* be GRANTED, and

---

[9] The Eighth Circuit has specifically held that "prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm. *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) (citing *Arnold v. Jones*, 891 F.2d 1370, 1373 (8th Cir. 1989)).

[10] Defendants have also raised the defense of qualified immunity. Because there is no evidence of a constitutional violation, there is no need for the Court to address qualified immunity as an alternative reason for dismissal. *See Schmidt v. City of Bella Villa,* 557 F.3d 564, 574 (8th Cir. 2009) ("Since we find no constitutional violation, we need not address the issues of qualified immunity and municipal liability"); *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) ("[I]f the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed").

Sanders's failure to protect claims against them be DISMISSED, WITH PREJUDICE.

Dated this 8th day of February, 2018.

_____
UNITED STATES MAGISTRATE JUDGE